82 A.3d 419

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Alexander KEATON, Appellant.**

Supreme Court of Pennsylvania.

Submitted Aug. 22, 2013.

Decided Dec. 17, 2013.

Michael Hugh Gonzales, Esq., Hunter Stuart Labovitz, Esq., Defender Association of Philadelphia, for Alexander Keaton.

Hugh J. Burns, Esq., Philadelphia, William George Young, Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice STEVENS.

In this PCRA capital appeal, Alexander Keaton asserts the PCRA court erroneously denied his underlying claim that his invocation of a Fifth Amendment right to counsel during custodial interrogations on a rape charge invalidated uncounseled, incriminating statements he gave weeks later in unrelated murder and rape cases. Finding evidentiary support for the PCRA court's factual determination that Keaton never invoked his right to counsel in the initial rape case, we affirm.

The underlying facts and procedural history are set forth in our earlier disposition of Keaton's PCRA appeal, *Commonwealth v. Keaton*, 615 Pa. 675, 45 A.3d 1050 (2012), and may be reproduced herein as follows:

> In December, 1992, Keaton was charged with rape and related offenses stemming from the November, 1992 sexual assault of Nadine S. One month later, the body of Keaton's ex-girlfriend, Sherrill Ann Hall, was found. Police questioned Keaton, who was in custody for the attack on Nadine S., about Hall's death. After waiving his rights, Keaton gave a written statement incriminating himself in the killing, and he was charged with murder. Later that day, police questioned Keaton about the June, 1992 rape of another woman, Michelle B. After waiving his rights, Keaton gave a written statement in which he admitted having oral sex with this victim, but denied assaulting her. He was charged with the rape of Michelle B. and related offenses. The Commonwealth moved to consolidate the charges for all three victims. Over defense objection, the trial court granted the motion. Prior to trial, Keaton moved to suppress his statements; the motion was denied, and Keaton was tried before a jury and found guilty of first degree murder, rape, and related offenses. At the penalty phase, the Commonwealth sought to prove the following aggravating circumstances: the murder was committed in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and the defendant had a significant history of felony convictions involving the use or

threat of violence to the person, *id.*, § 9711(d)(9). Keaton sought to establish the following mitigating circumstances: he was under the influence of extreme mental or emotional disturbance because of his drug addiction, *id.*, § 9711(e)(2); his age (31) at the time of the crime, *id.*, § 9711(e)(4); and any other evidence of mitigation concerning his character and record or the circumstances of the offense, *id.*, § 9711(e)(8). The jury found no mitigating circumstances and one aggravating circumstance, that the murder occurred in perpetration of the felony of rape, *id.*, § 9711(d)(6); accordingly, Keaton was sentenced to death. *Id.*, § 9711(c)(1)(iv).

This Court affirmed on direct appeal, and the United States Supreme Court denied certiorari. *Keaton v. Pennsylvania,* 528 U.S. 1163, 120 S.Ct. 1180, 145 L.Ed.2d 1087 (2000). Keaton timely filed a *pro se* PCRA petition and received appointed counsel, who filed an amended petition alleging all prior counsels' ineffectiveness for not raising numerous guilt and penalty phase issues. The PCRA court held a hearing on the sole issue of trial counsel's ineffectiveness for failing to investigate and present mitigating evidence at the penalty phase. The PCRA court rejected Keaton's guilt phase claims, denying him a new trial; however, the court concluded trial counsel was ineffective for failing to develop and present mitigating evidence, and granted a new penalty hearing.

Keaton appealed from the denial of his guilt phase issues the Commonwealth appealed from the grant of a new penalty phase. The PCRA court's Rule 1925(a) opinion did not address several of the issues in detail, merely stating it found Keaton's claims of guilt phase error meritless and would not further discuss them; the only penalty phase issue the court addressed was trial counsel's ineffectiveness for not investigating and presenting mitigating evidence at the penalty phase. *See* PCRA Court Opinion, 9/11/03, at 12–22. Without conclusive findings regarding whether Keaton is mentally retarded, we could not address his *Atkins* claim; accordingly, we remanded for the PCRA court to

consider the claim's merits and issue an opinion detailing its findings. *See Per Curiam* Order, 1/22/09; *see also Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624, 632–33 (2005) (where both parties' experts' testimony was equivocal on issue of mental retardation, wavering between "borderline retarded" and "mentally retarded," remand for evidentiary hearing was necessary). The PCRA court complied, issuing an opinion rejecting Keaton's claim of mental retardation and holding his *Atkins* claim was meritless. *See* PCRA Court Opinion, 11/13/09, at 1, 16–18.

*Keaton*, 615 Pa. at 690–92, 45 A.3d at 1058–60 (2012) (footnotes deleted).

In our initial disposition of Keaton's PCRA appeal, we affirmed the PCRA order denying guilt phase relief in all respects except on the single factual question of whether Keaton invoked his right to counsel during his December 19, 1992 arrest and interrogation on charges of raping Nadine S. and, if so, whether his so doing rendered presumptively involuntary his January 13, 1993 incriminating statements given during uncounseled, custodial interrogations on other rape and murder cases. We therefore reversed on that issue and remanded the matter to the PCRA court directing it to conduct an evidentiary hearing in order to develop the factual record. We further instructed that if the PCRA court found that Keaton invoked the right, it was to address whether under the recent United States Supreme Court decision *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010) (holding a 14 day period between initial and subsequent interrogation, where defendant had benefit of returning to general prison population during that time, sufficient to dissipate coercive effects) the January interrogation was nevertheless lawful.

### *Facts*

Taking place on November 12, 2012, the court-ordered hearing pitted Keaton's testimony that upon his arrest of December 19, 1992, he employed his customary practice of demanding a lawyer against police testimony aimed at im-

peaching Keaton's credibility, given the unavailability of either the arresting officer or interviewing detective to provide direct testimony denying that any such invocation was ever made. Keaton recalled the circumstances surrounding his December 19, 1992 arrest, stating he had just exited a grocery store on Ridge Avenue, Philadelphia, when a uniformed police officer standing alongside a patrol car called him over for a brief talk before detaining him. N.T. 11/16/12 at 8. Handcuffed and seated in the back of the patrol car, Keaton observed the officer walk over to Nadine S., whom Keaton knew from the neighborhood, and talk to her for several minutes before returning to inform him he was being arrested for rape. N.T. at 8. Believing the officer was unwilling to listen to "his side of the story," Keaton testified, he asked for a lawyer. N.T. at 8.

Keaton claimed on direct examination that he made this request in the presence of arresting officers as a matter of routine, as it had recently procured his release from police detention on two occasions in the recent past, including several weeks earlier in the Nadine S. case at a South Philadelphia police station and in a September 14th, 1992 arrest, also on allegations of rape. N.T. at 9–10, 14–15. "That's [requesting a lawyer] what you do in the hood. You don't speak to the police[,]" Keaton testified. N.T. at 19.

Cross-examination of Keaton yielded inconsistent testimony that while he was sitting in the back seat of the patrol car on December 19, 1992, the arresting officer engaged him in conversation and, in fact, "wanted to hear [his] side of the story." N.T. at 24. Keaton, however, testified that he declined to tell his side and instead asked for a lawyer, which differed from his earlier testimony that the officer was unwilling to listen. N.T. at 25. Keaton also confirmed that the officer had not read *Miranda* warnings or been prepared to take notes at the time Keaton claims to have requested a lawyer.

According to Keaton, the officer transported him to a police station without a word, placed him in an interrogation room situated "to the back," and closed the door behind him. N.T. at 11. He further described the room as little and windowless,

with tables and two chairs. N.T. at 11. An "olive-complected, dark hair[ed]" detective who was "smaller than [Keaton]" entered, Keaton said, and he informed Keaton of his *Miranda* rights. N.T. at 12, 26–27. Keaton testified that he again asserted his right to counsel, and the detective consequently left the room. N.T. at 13.

Commonwealth witness Lieutenant Michael Boyle provided a differing account of both the interrogation site and the physical description of the detective. He described the South Philadelphia Sex Crime Unit to where Keaton was transported as having no such interrogation room in the back; defendants were interviewed at the investigating detective's desk in an open room where all detectives worked. N.T. at 58–59. He also knew the detective assigned to Keaton's case, George Hicks, and was of the opinion that he was neither olive-complexioned nor aptly described as "dark-haired" given his baldness. N.T. at 55.

The Commonwealth also called the arresting officer from the November 22, 1992 arrest, Officer Jose Perez, who claimed to have a vivid recollection of the arrest. Perez testified Keaton did not ask for a lawyer at any time during his arrest and transport to the Sex Crimes Unit. N.T. at 44–48. Also refuting Keaton's claimed practice of always asking for a lawyer was Officer Christopher Boyle, who was assigned to interview Keaton in a cell at the Sex Crimes Unit after Keaton's September 14, 1992 arrest on suspicion of rape in another case. Christopher Boyle acknowledged Keaton re-peatedly refused to talk "about that girl," but unequivocally testified that Keaton never once demanded an attorney. N.T. at 75–76. Boyle claimed to remember the moment well be-cause he released Keaton only to learn months later on that Keaton was arrested on multiple murder charges. N.T. at 79.

By the end of the hearing, the PCRA court remarked that its credibility assessment would be outcome determinative, for there was, in its opinion, evidentiary support for either conclu-sion depending upon whose testimony it chose to credit. Sufficient to support Keaton's assertion, if believed, was his explanation that he invoked the right on December 19, 1992

not only in conformance with prevailing wisdom in his neighborhood but also because his own personal experience had shown the act to instantly stop prior investigations into his involvement in crimes. The investigatory paperwork of December 19, 1992 likewise was not inconsistent with Keaton's having asked for an attorney. Though lacking direct evidence to disprove the alleged invocation, the Commonwealth's proffer of circumstantial evidence relating both to Keaton's prior arrests and to how the Sex Crimes Unit's records suggested Keaton probably did not expressly request an attorney at the station on December 19th, if believed, were sufficient to undermine Keaton's assertion.

Ultimately, and not without underscoring the difficulty of inferring from a record cobbled together twenty years after the fact whether Keaton did or did not utter words requesting an attorney, the PCRA court deemed Keaton's testimony incredible and the Commonwealth witnesses' testimonies credible. Most persuasive to the court was the testimony of former Sex Crime Unit Sergeant Michael Boyle, the supervisor of Detective George Hicks, who was assigned to investigate Keaton's case.

Boyle's explanation that any interrogation of a suspect at the Sex Crime Unit would have taken place at the assigned detective's desk situated in a large, crowded room where all the other detective's desks were located served to impeach Keaton's recollection of events on December 19th, as Boyle flatly rejected the notion of a secluded, windowless, back of the building interrogation room as described by Keaton. Also impressing the court was Boyle's testimony undermining Keaton's physical description of Hicks as an olive-complexioned, dark haired man. Boyle could not recall any of his detectives fitting that description, and he denied that Hicks had either olive skin or would be described as having dark hair, as he was balding.

Also factoring prominently in the PCRA court's decision was Boyle's interpretation of what he called the canned statement "[t]here was no statement taken from the above male [Keaton] by the assigned at this time" recorded by Hicks in

his report. N.T. at 55. While conceding the statement could possibly mean Keaton either refused to give a statement or requested a lawyer, Boyle explained that if a detective had Mirandized the suspect and received a request for an attorney in reply, then it was expected that such occurrence would be recorded as the reason questioning stopped. N.T. at 56–57. Boyle's conclusion from the report, therefore, was that Keaton probably refused to talk and Hicks made no further attempt to obtain a statement.

"Despite the lack of evidence about the specific happenings on December 19, 1992," the PCRA court concluded, the totality of circumstantial evidence provided by Commonwealth witnesses convinced it that Keaton had not invoked his Fifth Amendment right to counsel on that date. Having made this determination, the court had no need to address the applicability of *Shatzer, supra.*

### Arguments

Keaton presents for this Court's review the question of whether the PCRA court erred in denying his claim that he invoked his right to counsel at his December 19, 1992 custodial hearing; whether the admission of his statements to police on January 13, 1993 after such invocation thus violated his rights under the Fifth Amendment; and whether all prior counsel were ineffective for failing to raise this claim. Brief for Appellant at 3.

His challenge to the PCRA court's determination rests on the argument that the court's factual findings are without evidentiary support. Most critical in this respect, Keaton maintains, is that the Commonwealth presented no witness who could directly refute his contention that he invoked his right to a lawyer during December 19, 1992. Specifically, neither of the two men to whom Keaton claims to have invoked his right on that day-his arresting officer, Officer Pitts, and the detective assigned his case at the Sex Crime Unit, George Hicks-testified at his hearing. Substantiating his claim further, Keaton says, his paperwork generated by Detective Hicks at the Sex Crimes Unit stating that no

statement was obtained from Keaton. Further contributing to the court's error, Keaton continues, was its disregard of his testimony that it was only common sense that he would have invoked the right on December 19th, as those who grew up in his neighborhood "learned at an early age not to talk to police," and had successfully employed that tack during two recent arrests on September and November of 1992 in which he gained immediate release after asking for a lawyer. Finally, Keaton alludes to how certain Commonwealth witnesses corroborated the details he supplied in his testimony, including his recollection of arresting officers in September, his description of Detective Hicks—which, contrary to the court's conclusion, Keaton says, was corroborated by Michael Boyle's testimony that Hicks was 5'8", stocky, and resembled "Super Mario," and that he remembered being brought to the South Philadelphia Sex Crimes Unit on December 19, 1992. Collectively, this evidence overwhelmingly demonstrated that Keaton invoked his right to counsel at the December 19, 1992 custodial interrogation, Keaton concludes.

The Commonwealth counters that the evidentiary record sufficiently supports the court's credibility determinations such that we are precluded from overturning the factual finding at issue. Decisional law sets forth no requirement that a fact finder must accept testimony that goes without direct contradiction, the Commonwealth asserts, and the PCRA court was free to accept all, some, or none of Keaton's testimony that he asked for a lawyer on December 19, 1992. Moreover, Commonwealth witnesses undermined Keaton's testimony that his September and November arrests demonstrated his pattern of practice of asking for a lawyer whenever arrested. Officer Christopher Boyle testified that Keaton repeated in unequivocal terms during the September 14, 1992 custodial interview at the Sex Crime Unit that he would speak to Boyle about anything except the alleged rape victim in that case, Shareefa H., but he never asked for a lawyer during their entire exchange. Nor did Keaton invoke the right at any time while Officer Jose Perez arrested Keaton and transported him to the Sex Crimes Unit on November 22, 1992 on

suspicion of raping Donna S., Perez testified. In addition, Sex Crime Unit Michael Boyle successfully called into question Keaton's recollection of events through his testimony that Keaton could not have been interviewed in a secluded interrogation room that did not exist. Interviews took place at the desk of the detective assigned to the case, in a room in which all other detectives and their desks were located. Nor did Boyle believe George Hicks could accurately be described as olive-complexioned and dark haired. In sum, the totality of this evidence sufficed to support the PCRA court's credibility determinations.

### *Discussion*

Our standard of review is well settled: "In addressing the grant or denial of post-conviction relief, an appellate court will consider whether the PCRA court's conclusions are supported by record evidence and are free of legal error." *Commonwealth v. Williams,* 597 Pa. 109, 950 A.2d 294, 299 (2008) (citations omitted). Moreover, we are bound by the PCRA court's credibility findings where those determinations are supported by the record. *Commonwealth v. Moore,* 580 Pa. 279, 860 A.2d 88, 99 (2004) (citation omitted).

Keaton's disagreement with the PCRA court's credibility determinations is simply not enough to set aside the court's order. Revealed repeatedly throughout the notes of testimony taken of the November 16, 2012 evidentiary hearing is the PCRA court's appreciation that the factual question before it will turn entirely upon its credibility assessment; the court painstakingly asked numerous follow-up questions of witnesses in its clear attempt to secure as clear, comprehensive, and detailed a record as possible about what transpired nearly twenty years earlier on December 19, 1992. In the end, after Appellant often testified he asked for a lawyer on that day and Commonwealth witnesses often addressed other matters suggesting Appellant did not, the PCRA court reached the conclusion that Appellant certainly refused to give a statement but did not go so far as to demand a lawyer.

The court acknowledges that the record could otherwise arguably support Appellant's testimony if he were deemed credible, but that observation, even if true, provides no ground for disturbing the decision below. *See Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468, 476 (1977) (recognizing well-settled principle that "[w]e will not disturb the findings of the PCRA court if they are supported by the record, even where the record could also support a contrary holding"). As it was, the court disbelieved Appellant, as was its prerogative under prevailing standards and believed, instead, Commonwealth witnesses who impeached various aspects of Keaton's account as described above. Because evidentiary support, detailed above, existed to sustain this determination, we discern no grounds upon which to disturb the court's credibility decision in favor of the Commonwealth.

Having failed to invoke his right to counsel prior to giving his uncounseled, incriminating statements at his custodial interrogation of January 13, 2013, Appellant raises a meritless claim that all prior counsel ineffectively failed to challenge his statement on Fifth Amendment grounds. "[I]t is axiomatic that [trial] counsel will not be considered ineffective for failing to pursue meritless claims." *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 304 (1999), *reargument denied* (citation omitted). Additionally, "[p]ost-trial counsel will not be deemed ineffective for failing to raise and preserve meritless challenges to the effectiveness of trial counsel." *Commonwealth v. Thuy*, 424 Pa.Super. 482, 623 A.2d 327, 335 (1993) (citations omitted). Accordingly, he may obtain no guilt-phase relief through his ineffective assistance of counsel claim on this basis.

Order Affirmed.

Chief Justice CASTILLE Justices SAYLOR, EAKIN, BAER, TODD and McCAFFERY join the opinion.