J-S06006-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL T. DEGILIO | : | |
| | : | |
| Appellant | : | No. 1314 EDA 2019 |

Appeal from the PCRA Order Entered February 27, 2019
In the Court of Common Pleas of Carbon County Criminal Division at
No(s): CP-13-CR-0000232-2010

BEFORE: LAZARUS, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY LAZARUS, J.: **FILED JULY 31, 2020**

Michael T. Degilio appeals from the order, entered in the Court of Common Pleas of Carbon County, dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Upon careful review, we affirm.

We have previously set forth the underlying facts of this case as follows:

On February 24, 2009, [Degilio] sexually assaulted a patient[1] that he was treating for severe depression and anxiety. The assault occurred during the patient's second appointment with [Degilio]. On the previous occasion, [Degilio] asked the victim sexually suggestive questions. Although she was perturbed by [Degilio]'s behavior, the victim elected to continue her treatment with [Degilio].

During the second session, [Degilio] directed the victim to sit beside him on the couch in his therapy room. He kissed the victim, both on the lips, and after pulling down her shirt and bra, upon her right breast. [Degilio] then stood facing the victim as she

---

[1] Degilio was a licensed psychologist with a doctorate in clinical psychology.

remained seated. [Degilio] lowered his pants, took the victim's right hand, and placed it on his penis. He then drew her head towards his penis, and directed her to perform oral sex. Within an hour of the assault, the victim informed her friend of the incident, and subsequently reported it to the police.

In addition to setting forth the foregoing facts, the victim testified during a jury trial that a few days before her ordeal with [Degilio], she received a prescription for Klonopin in connection with her voluntary admission to the Behavioral Health Unit ("BHU") of Gnaden Huetten Memorial Hospital. She stated that she informed [Degilio] that the medication made her feel confused and "zoned out."

The Commonwealth also proffered testimony from Dr. Ilan Levison, a board-certified psychiatrist. He testified that the victim's daily dosage of eight milligrams of Klonopin was excessive and would have caused her to have symptoms of extreme confusion, delirium, fatigue, and gait impairment. In addition, he explained that, when people suffering from depression take a high dosage of Klonopin, they are extremely vulnerable and susceptible to manipulation by others.

*Commonwealth v. Degilio*, 1422 EDA 2015, at 1-2 (Pa. Super. filed June, 9, 2016) (unpublished memorandum) (citations to record omitted).

On May 15, 2014, a jury convicted Degilio of involuntary deviant sexual assault—forcible compulsion, indecent assault—forcible compulsion, and indecent exposure. On November 17, 2014, the court sentenced Degilio to an aggregate term of incarceration of four to eight years, followed by two years of probation. Post-sentence motions were denied. This Court affirmed Degilio's judgment of sentence, *see id.*, and our Supreme Court denied allowance of appeal. *See Commonwealth v. Degilio*, 160 A.3d 788 (Pa. 2016) (Table).

On August 3, 2017, Degilio filed a counseled PCRA petition in which he alleged various claims of trial counsel's ineffectiveness. Following a hearing,

- 2 -

the PCRA court denied relief. This timely appeal follows, in which Degilio raises the following claims for our review:[2]

> 1. Was trial counsel ineffective for failing to investigate, interview, or present good character witness testimony on Degilio's behalf, thus prejudicing his defense in such a manner that no reliable adjudication of guilt could have taken place?
>
> 2. Was trial counsel ineffective for failing to investigate, interview, or preclude, by way of objection or motion in *limine*, alleged bad character evidence against Degilio provided by Brianna Edgar and Candy McMurray?
>
> 3. Was trial counsel ineffective for failing to object to, preclude by motion in *limine*, or limit prejudice by way of cautionary instruction, the inadmissible and prejudicial prior bad act evidence elicited by the Commonwealth from Chief Kenneth Barnes?
>
> 4. Was trial counsel ineffective for failing to utilize the testimony of Dr. Clifford H. Schilke and for refraining from attacking Commonwealth witnesses with complainant's medical records and physician notes, thereby preventing Degilio from establishing that the complainant was neither mentally nor physically impaired or compromised from Klonopin at the time of the alleged sexual assault?

Our standard of review is well-settled. In reviewing the denial of PCRA relief, "this Court is limited to ascertaining whether the evidence supports the determination of the PCRA court and whether the ruling is free of legal error." *Commonwealth v. Andrews*, 158 A.3d 1260, 1263 (Pa. Super. 2017). In rendering our decision, we are bound by the credibility determinations of the PCRA court that are supported by the record. *Commonwealth v. Keaton*, 82 A.3d 419, 425 (Pa. 2013).

---

[2] We have rephrased Degilio's claims for purposes of clarity.

- 3 -

Degilio's claims all assert the ineffectiveness of his trial counsel. Where ineffective assistance of counsel is pled, counsel is presumed effective and the petitioner bears the burden of proving ineffectiveness. *Commonwealth v. Cooper*, 941 A.2d 655 (Pa. 2007). In order to obtain relief, a petitioner must prove that counsel's representation was deficient, and that he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668 (1984). Specifically, a petitioner must plead and prove, by a preponderance of the evidence, that

> (1) the underlying claim has arguable merit; (2) counsel's actions lacked any reasonable basis, and (3) counsel's actions prejudiced the petitioner. Counsel's actions will not be found to have lacked a reasonable basis unless the petitioner establishes that an alternative not chosen by counsel offered a potential for success substantially greater than the course actually pursued. Prejudice means that, absent counsel's conduct, there is a reasonable probability the outcome of the proceedings would have been different.

*Commonwealth v. Brown*, 48 A.3d 1275, 1277 (Pa. Super. 2012) (citation omitted).

Degilio first argues that trial counsel was ineffective for failing to investigate, interview, or present good character witnesses on his behalf at trial. Degilio claims that counsel failed to advise him of his right to introduce good character evidence, and Degilio only learned of that right in consulting with appellate counsel. Brief of Appellant, at 16. Degilio asserts that, had he been aware of his right to present character witnesses, he would have presented the testimony of family members and friends to attest to his reputation in the community as a peaceful, non-violent, and law-abiding person. *Id.* at 17. Degilio is entitled to no relief on this claim.

- 4 -

As a general rule, evidence of a person's character may not be admitted to show that individual acted in conformity with that character on a particular occasion. Pa.R.E. 404(a). However, Pennsylvania Rule of Evidence 404(a)(1) provides an exception which allows a criminal defendant to offer evidence of his or her character traits which are pertinent to the crimes charged and allows the Commonwealth to rebut the same. *Id.* at 404(a)(2)(A).

Pennsylvania Rule of Evidence 405 governs methods of proving character and provides, in relevant part, as follows:

> (a) By Reputation. When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation. Testimony about the witness's opinion as to the character or character trait of the person is not admissible.
>
>> (1) On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct probative of the character trait in question.
>>
>> (2) In a criminal case, on cross-examination of a character witness, inquiry into allegations of other criminal conduct by the defendant, not resulting in conviction, is not permissible.

*Id.* at 405(a).

This Court has previously explained the limited purpose for which character evidence may be offered:

> It has long been the law in Pennsylvania that an individual on trial for an offense against the criminal law is permitted to introduce evidence of his good reputation in any respect which has "proper relation to the subject matter" of the charge at issue. Such evidence has been allowed on a theory that general reputation reflects the character of the individual and a defendant in a criminal case is permitted to prove his good character in order to negate his participation in the offense charged. The rationale for the admission of character testimony is that an accused may not

- 5 -

be able to produce any other evidence to exculpate himself from the charge he faces except his own oath and evidence of good character.

It is clearly established that evidence of good character is to be regarded as evidence of substantive fact just as any other evidence tending to establish innocence and may be considered by the jury in connection with all of the evidence presented in the case on the general issue of guilt or innocence. Evidence of good character is substantive and positive evidence, not a mere make[-]weight to be considered in a doubtful case, and, . . . is an independent factor which may of itself engender reasonable doubt or produce a conclusion of innocence. Evidence of good character offered by a defendant in a criminal prosecution must be limited to his general reputation for the particular trait or traits of character involved in the commission of the crime charged. The cross-examination of such witnesses by the Commonwealth must be limited to the same traits. Such evidence must relate to a period at or about the time the offense was committed, and must be established by testimony of witnesses as to the community opinion of the individual in question, not through specific acts or mere rumor.

*Commonwealth v. Johnson*, 27 A.3d 244, 248 (Pa. Super. 2011), quoting *Commonwealth v. Luther*, 463 A.2d 1073, 1077–78 (Pa. Super. 1983) (citations omitted).

Further, a defense counsel's failure to call a particular witness to testify does not constitute ineffectiveness *per se*. *Commonwealth v. Cox*, 983 A.2d 666, 693 (Pa. 2009). "In establishing whether defense counsel was ineffective for failing to call witnesses, a defendant must prove the witnesses existed, the witnesses were ready and willing to testify, and the absence of the witnesses' testimony prejudiced petitioner and denied him a fair trial." *Id.* at 693.

Here, Degilio claims that, but for the ineffectiveness of trial counsel, he would have sought to introduce evidence of his reputation as a peaceful, non-

violent, and law-abiding person.[3] At the PCRA hearing in this matter, Degilio presented testimony from four individuals whom he identified as character witnesses he would have called at trial. All of the individuals testified that they were never asked to testify but they would have been available and done so. Accordingly, Degilio has satisfied the first two prongs of the ineffectiveness test for failure to call witnesses. **Cox**, **supra**. Degilio cannot, however, establish prejudice.

Degilio first called Dr. Lori Lawson, his sister-in-law, at the PCRA hearing. On direct examination, she stated that she would have testified to Degilio's reputation in the community as "law-abiding, peaceful and nonviolent." N.T. PCRA Hearing, 4/11/18, at 126. On cross-examination, counsel for the Commonwealth inquired as to the identity of those with whom she discusses Degilio. Doctor Lawson testified that she talks about him with her sister, Degilio's wife. **Id.** at 131.

Next, Rogene Seidel testified that she had known Degilio for 26 years, having met him when they were both obtaining their master's degrees. **Id.** at 133. She testified that, since that time, she would meet Degilio "a couple times a year" for "dinner or, you know, hang out." **Id.** On direct examination,

---

[3] Here, the crimes of which Degilio was accused involved the use of psychological manipulation of a vulnerable individual with a recent history of suicidal ideation, not physical force or violence. Where force or violence, *per se*, are not used in the commission of an offense, it is questionable whether peacefulness and non-violence are pertinent character traits to the offenses charged. However, because of our disposition of this issue, we need not reach that question today.

Seidel stated that she would have testified as to Degilio's reputation in the community for being law-abiding, peaceful and nonviolent. *Id.* at 134. On cross-examination, Seidel testified as follows:

Q: And who . . . do you talk to about Mr. Degilio?

A: His wife, other friends that we have in common.

Q: His wife?

A: Yes.

Q: And who else?

A: People that we worked with over the years.

Q: And how would he come up in conversation?

A: Recently or in the past?

Q: Both.

A: In the past, just the kind of work Mike was doing, the kind of work I was doing. We're in the same business of psychology. People I'd run into, you know, did you see Mike lately? How's he doing? . . .

Q: So what specifically would you be talking [about] to these people that you worked with regards to him being nonviolent?

A: Just I guess [my] opinion of Mike that I have of my friends that know him is that he's pretty laid back, easy going, easy to talk to. When you needed somebody to talk to, he's there for you.

*Id.* at 137-38.

The Court examined Seidel as follows:

[BY THE COURT]: [W]hat have people told you about his reputation? That's what we're talking, reputation.

A: Yes.

Q: We're not talking about your personal knowledge. We're talking about his reputation in the community. My question is,

- 8 -

what have people told you about his reputation with respect to [being law-abiding, peaceful and nonviolent]?

A: That he is law-abiding—

Q: Okay.

A: —and he's peaceful.

Q: So when you talk to people, they say, oh, Mike is a law-abiding person?

A: No, that he's a decent person. He's a good person, that he's a helpful person, an honest person.

*Id.* at 139-40.

Linda Lawson ("Linda"), another sister-in-law who resides in Florida, testified that she had known Degilio since 1997. *Id.* at 142. On direct examination, Linda testified to Degilio's reputation in the community for being law-abiding, peaceful and nonviolent. *Id.* at 145. On cross-examination, the Commonwealth tested the basis for this opinion:

Q: Now, you had said that you were extremely familiar with Mr. Degilio's reputation in his community for being law-abiding, peaceful and nonviolent.

A: Yes.

Q: Okay. Who did you talk to about him? Who did you talk to about those traits with regards to Mr. Degilio?

. . .

A: Okay. Nancy Meiser, Owen Kupp, Jill Anderson. That's it.

Q: All right. And who is Nancy Meiser?

A: She's a friend of the family.

Q: A friend of the family. And where does she live?

A: In Tamaqua.

Q: And Owen Kupp?

- 9 -

A:  In Tamqua, also.

Q:  And that is a family friend?

A:  He's a family member.

. . .

Q:  And Jill Anderson?

A:  She's a friend of mine in Florida.

Q:  And what did they say?

. . .

A:  That he was a peaceful, nonviolent, law-abiding citizen.

Q: Well, I mean, how did they—in what context did they say that? Did they just, you know, say, hey, how's Mike?  He's a peaceful, nonviolent, law-abiding person?

A:  No.  They would just say, oh, he's very mellow, very friendly, very kind, loving, you know.

Q:  That's what would be talked about?

A:  Yes.

*Id.* at 150-51.

Finally, Paula Lawson ("Paula"), another of Degilio's sisters-in-law, testified that she had known Degilio since 1997.  Paula testified to Degilio's reputation in the community as a "law-abiding person" with a "good reputation" who was "laid back and never violent."  *Id.* at 154.  On cross-examination, Paula stated that she had spoken about Degilio with "a guy that worked with [her] at Lowe's" and with her sister.  *Id.* at 162.

Based upon our review of the proposed testimony of Degilio's four character witnesses, we conclude that the evidence did not meet the requirements necessary for the admission of character evidence.  Because

- 10 -

Degilio has failed to show that his proposed witnesses would have given the proper testimony, he cannot establish that trial counsel was ineffective for failing to present their testimony at trial. **Cox**, **supra**.

First, Dr. Lawson's proposed testimony does not meet the threshold for character evidence because it would not have provided insight into Degilio's reputation *in the community*. Although Dr. Lawson initially testified that she was aware of Degilio's reputation in the community for being peaceful, law-abiding, and non-violent, on cross-examination it became apparent that she only spoke about Degilio with her sister, Degilio's wife. Our Supreme Court has explained that "[c]haracter evidence is not the opinion of one person or even a handful of persons, but must represent the consensus of the community." **Commonwealth v. Keaton**, 45 A.3d 1050, 1074 (Pa. 2012) (citation omitted). The insight into Degilio's character gained from speaking about him with one individual does not equate to knowledge of his general reputation within his community. Accordingly, Dr. Lawson could not have offered proper character testimony at Degilio's trial.

Similarly, Paula Lawson testified that she has spoken about Degilio to "a guy that worked with [her] at Lowe's" and with her sister. N.T. PCRA Hearing, 4/11/18, at 162. As with Dr. Lawson's testimony, this evidence does not represent "the consensus of the community," **Keaton**, 45 A.3d at 1074, and is, therefore, improper character evidence.

Linda Lawson testified that her knowledge of Degilio's character was gleaned from speaking to three individuals, two of whom were family

- 11 -

members and one of whom she described as "a friend of [hers] in Florida." N.T. PCRA Hearing, 4/11/18, at 151. The opinions of three individuals—one of whom does not even reside in the same community as Degilio—does not a "community reputation" make. *See Keaton*, *supra*. Moreover, Linda's proposed testimony failed to address the character traits proffered by Degilio as relevant to the charges in question. When asked by the PCRA court to clarify whether she ever discussed with the three individuals Degilio's reputation for being peaceful, law-abiding and nonviolent, Linda testified: "No. They would just say, oh, he's very mellow, very friendly, very kind, loving, you know." N.T. PCRA Hearing, 4/11/18, at 151. Thus, as Linda's proposed testimony addressed neither Degilio's reputation in the community, nor the character traits he wished to place in issue, it is improper character evidence.

Finally, Rogene Seidel testified that she discussed Degilio with his wife and "[p]eople that [she and Degilio] worked with over the years." *Id.* at 137. This testimony is, arguably, reflective of "the consensus of the community." *Keaton*, 45 A.3d at 1074. However, Seidel's testimony would have been irrelevant in the context of the instant matter. As noted above, Seidel's familiarity with Degilio was limited to his reputation as "a decent person. He's a good person, that he's a helpful person, an honest person." N.T. PCRA Hearing, 4/11/18, at 140. These qualities are not relevant to the character traits Degilio sought to place in issue, i.e., those of peacefulness, nonviolence, and law-abidingness.

- 12 -

In sum, Degilio has failed to establish that the testimony of any of his would-be witnesses would have been admissible as character evidence under Pa.R.E. 404(a) and 405(a). Therefore, we cannot find that the absence of this testimony prejudiced Degilio as to require a new trial. Accordingly, Degilio has failed to demonstrate that trial counsel was ineffective for failing to investigate or call these witnesses at trial.[4]

Degilio next claims that trial counsel was ineffective for failing to seek the exclusion of inadmissible prior bad act evidence elicited by the Commonwealth from Mohoning Township Police Chief Kenneth Barnes. Degilio further asserts that counsel was ineffective for failing to seek a cautionary instruction regarding statements made by Chief Barnes regarding alleged prior sexual contact between Degilio and "multiple females." Brief of Appellant, at 52.

Some background is in order. Degilio's defense in this matter was that he never had sexual contact with the victim and that he was, in fact, engaging in sexual relations with another woman at the time he allegedly assaulted the victim. The victim, however, testified to the existence of a mole in Degilio's groin area. Photographs taken by the police pursuant to a warrant confirmed the existence of the mole. At trial, Chief Barnes testified regarding his

---

[4] Degilio's second appellate claim challenges the validity of trial counsel's underlying rationale for not offering character evidence. Because we have determined that Degilio was not prejudiced by the absence of his proposed character witnesses, this claim is moot.

interaction with Degilio during and after the execution of the search warrants,[5] at which time Degilio agreed to make a statement. Chief Barnes testified that, during that conversation, Degilio posited that the victim was aware of his birthmark because someone had informed her of its existence. N.T. Trial, 5/12/14, at 186. Chief Barnes responded that it was "unlikely or improbable that someone had done this." *Id.* In response, Degilio informed Chief Barnes, "I've had sex with other women. I'll give you their names." *Id.* at 187. Chief Barnes' testimony continued:

> [CHIEF BARNES]: I asked him if they were patients. He responded, "No." I asked him if this was between 2006 when he was working for other agencies or from the time he opened up his office. He responded, "Yes." I said, "Well, the answer you gave me was plural. You said women, not a woman. How many were there?" He said "About five." And I said, "About five or five to ten? How many?" His response was, "Five is good."
>
> Q: Did you inquire with regards to his fiancée?[6]
>
> A: I asked him if his—I asked him if Wendy, his fiancée, knew about his sexual encounters. And his response was, "No, she did not"—or "No," frankly.
>
> Q: Did you ask him who these women were?
>
> A: Yes, I did.
>
> Q: How did he respond?
>
> A: It was people he worked with. There was a nurse at a hospital, a case worker at another place that he worked with, a secretary at a mental healthcare agency. I asked him, "Oh, where did these acts take place?" His first response was "In a car." And I asked

---

[5] Police also obtained a warrant to search and seize files and computers at Degilio's office.

[6] Degilio's then-fiancée is now his wife.

him if they ever took place in his office, and he answered "Yes." And I asked him if any occurred in his home. That he stated "no[.]"

Q: When you asked him to give you the names of these ladies, did he do that?

A: No. He originally wanted to and then had a change of heart, change of mind that he didn't want to, might have—things would become complicated. I asked him, I said, "Were any of them married?" And the answer was "Yes."

Q: And what did he specifically say why he did not want to disclose these names?

A: "I'd rather not, it would cause complications."

*Id.* at 187-88.

Degilio argues that trial counsel "sat idle, while Chief Barnes depicted [him] as a promiscuous adulterer who had previously engaged in multiple clandestine sexual relationships with several females prior to meeting [the victim." Brief of Appellant, at 56. Degilio argues that this "character attack" violated Pa.R.E. 403 and 404 and garnered the Commonwealth an "unfair tactical advantage." *Id.* at 56-57. He argues trial counsel allowed the Commonwealth to "attack [his] character trait for chastity" and to "pervade the jury's exclusive function of determining witness credibility and [Degilio's] ultimate culpability." *Id.* at 59. Degilio further argues that counsel's failure to object to Chief Barnes' testimony "permitted the Commonwealth to impermissibly bolster [the victim's] credibility by engaging in a full frontal attack on [Degilio's] lack of virtue and promiscuity[.]" *Id.* at 60.

At the PCRA hearing, trial counsel testified that he did not object to Chief Barnes' testimony because, by volunteering the fact that he had slept with

- 15 -

other women, Degilio had "opened the door."  N.T. PCRA Hearing, 5/3/18, at

191.  Counsel further stated:  "Don't get me wrong, it's not something that I

wanted necessarily to come out, but he opened the door.  But I didn't view

those as prior bad acts because they're not similar to what we're on trial for."

*Id.* at 192.

The PCRA court addressed the issue as follows:

This evidence was not presented by the Commonwealth to evidence any misconduct on [Degilio's] part or to evidence any criminal propensity by [Degilio] to engage in wrongful conduct. To the contrary, the evidence, as presented, expressly included [Degilio's] explanation that this was consensual sex and it never involved a patient.  As such, the evidence was clearly not introduced to establish that [Degilio's] contact with [the victim] was in conformity with his behavior towards other women in the past.  Nor is it a crime or necessarily wrong for a single man, even if engaged,[10] to engage in consensual sexual relations with another woman such that this conduct should be considered as propensity or "prior bad act" evidence.

> [10] At trial, [Degilio] testified that his relationship with his fiancée was an open one, under which he was free to engage in sexual relations with others, but his fiancée didn't want to know about it.

The evidence was relevant to showing at least one explanation given by [Degilio] as to how [the victim] would know of his birthmark and to assist the jury in judging [Degilio's] credibility in the context of his denial that he and [the victim] ever engaged in sexual relations with one another, defense counsel having previously advised the jury in opening statements that [Degilio] would be testifying.  This evidence also corroborated [the victim's] later testimony that during her first meeting with [Degilio] in his office on February 20, 2009, he told her that although he was engaged, he enjoyed sexual relations with other women.  We do not view this as character or propensity evidence barred by Rule 404(b), but as a relevant statement [Degilio] made to the police as part of Chief Barnes' criminal investigation of [the victim's] accusations.

It also needs to be understood that at the time this evidence was presented, trial counsel knew his alibi witness, Ms. Beckett, as well as [Degilio] would be testifying to their sexual relations with one another on the date of the offense. For [Degilio] to object or request a cautionary instruction to evidence of the same type he intended to present would only lessen the credibility of the defense in the eyes of the jury. As part of trial strategy it made no sense to object, and with respect to the element of prejudice necessary to support a claim of ineffectiveness of counsel, we see none.

Trial Court Opinion, at 22-23 (citations to record omitted).

We agree with the PCRA court that counsel was not ineffective for failing to object to Chief Barnes' testimony. The sexual activity to which Degilio referred in his interview with Chief Barnes occurred between consenting adults. Such activity is neither a bad act, nor criminal in nature, such that evidence thereof would be subject to the strictures of Rule 404(b). Our own research has uncovered no precedent supporting this proposition, and Degilio has directed our attention to none. Indeed, Degilio's own alibi defense was predicated on just the type of activity that he now seeks to characterize as "bad acts," i.e., he could not have assaulted the victim because, at the time the assault was alleged to have occurred, he was engaged in sexual activity with a woman who was not his then-fiancée. That woman, Bernadette Beckett, testified on Degilio's behalf that she engaged in a sexual relationship with him during a period of time in which they were both involved with other people. Moreover, Degilio testified on direct examination that his relationship with his then-fiancée was an open one, in which both parties were allowed to

pursue outside relationships.[7] It is simply disingenuous for Degilio to argue that evidence of his promiscuity is admissible when it suits his purposes, but not when presented by the Commonwealth for an otherwise relevant purpose. Here, evidence regarding Degilio's sexual relationships with other women was relevant to the Commonwealth's case in that it corroborated the victim's testimony that Degilio told her that he "cheated on [his fiancée] all the time and that he loves women." N.T. Trial, 5/12/14, at 56. In a "he said-she said" case such as this, establishing the credibility of the victim is essential to the Commonwealth's prosecution.

Moreover, trial counsel had a reasonable strategic basis for allowing the testimony to come in. As noted above, the victim was able to identify a mole near Degilio's groin. This knowledge of a distinguishing mark on Degilio's body—which was corroborated by police photographs—bolstered the victim's credibility by providing evidence that she had, in fact, had intimate contact with Degilio. The victim's knowledge of this mark is particularly powerful where Degilio's defense was not that his contact with the victim was consensual, but that there was no contact at all. Testimony that multiple other women had been in a position to observe Degilio's anatomy provided

_____

[7] Degilio testified as follows:

> We had an agreement that, if either of us met somebody who was—who fit, you know, what we wanted, we both understood, and we were fine with going the other way.

N.T. Trial, 5/14//14, at 48.

the defense with one explanation for the victim's knowledge. Specifically, the jury could have inferred that another of Degilio's paramours had informed the victim of the presence of the mole. Strategically, it was entirely reasonable for trial counsel to refrain from objecting to testimony that could effectively explain away a key element of the Commonwealth's case. Accordingly, because there existed a reasonable basis for counsel's failure to object, counsel cannot be deemed ineffective. **Brown**, **supra**.

Next, Degilio claims that trial counsel was ineffective for failing to call Dr. Clifford H. Schilke, the victim's treating psychiatrist, to testify at trial in order to refute the Commonwealth's evidence that the victim was "substantially psychologically compromised by her use of [K]lonopin." Brief of Appellant, at 69. Degilio argues that the victim's medical records indicate that she was "tolerating [K]lonopin well and did not complain of any side effects or any irregularities to either Dr. Schilke or the hospital personnel" during her inpatient treatment. **Id.** at 65. Although Degilio presented an expert who testified at trial that the victim's use of Klonopin would not have rendered her incapable of consent, that expert had never actually treated the victim. Degilio claims that the testimony of Dr. Schilke—who had treated the victim—would have been more persuasive in establishing that the victim was not overprescribed Klonopin, which was a "critical issue with respect to the Commonwealth being able to establish the elements of forcible compulsion." **Id.** at 68.

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements of the [ineffective assistance of counsel] test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Selenski*, 228 A.3d 8 (Pa. Super. 2020) (citation omitted).

Here, Degilio failed to establish that Dr. Schilke was available or willing to testify on his behalf at trial. Degilio presented neither an affidavit nor testimony from Dr. Schilke to that effect and is, therefore, unable to satisfy two of the five requirements for demonstrating counsel's ineffectiveness for failure to call a witness. *See Cox*, *supra* (petitioner must demonstrate witness was available and willing to testify for defense).

Moreover, trial counsel testified at Degilio's PCRA hearing that, due to the fact that Dr. Schilke was represented by counsel in the ongoing civil suit,[8] he did not believe he could communicate with Dr. Schilke directly. Counsel contacted Dr. Schilke's civil attorney to inquire about the possibility of Dr. Schilke testifying at Degilio's trial. Doctor Schilke's counsel informed Degilio's counsel that Dr. Schilke was "not going to be helpful" to Degilio's case. N.T. PCRA Hearing, 4/11/18, at 210. Indeed, counsel testified that Dr. Schilke's counsel reiterated this fact repeatedly, because trial counsel was "pushing him because [trial counsel] understood [t]hat Mr. Degilio wanted Dr. Schilke, and

_____

[8] The victim filed suit against Degilio and other parties, including Dr. Schilke.

[he] understood why he wanted Dr. Schilke." *Id.* at 184. Trial counsel further testified that he did not subpoena Dr. Schilke's testimony because he did not want to "call a witness and put him on without any kind of preparation and knowing what he's going to say on the stand." *Id.* at 210-11. Counsel stated:

> You want to provide the documents to the expert, have the expert review them. You want to be able to sit down with the expert, see if the expert then is going to be helpful, positive to your case, let the expert know what the Commonwealth's side of things are, and then if the expert can provide to you what you're looking for, use that expert.
>
> And you want an expert that's going to be truthful to you. I mean, I've had experts before that I'm looking for one thing, they're not able to provide it. You look for another expert. You want an expert that's going to be honest and frank with you, not someone that's just going to give you what you want because you're paying them a fee, and I felt that we found that in Dr. Fenichel.

*Id.* at 185-86.

In light of those facts, it was entirely reasonable for trial counsel to opt to retain another expert witness to testify on Degilio's behalf. For this reason also, Degilio is unable to establish trial counsel's ineffectiveness. **Brown**, **supra** (to prove ineffectiveness, petitioner must demonstrate counsel's action lacked any reasonable basis).

Finally, Degilio asserts that trial counsel was ineffective for failing to utilize the victim's medical records to impeach the testimony of the victim and Commonwealth expert witness Dr. Ilan Levinson. Specifically, Degilio argues that the medical records do not reflect any complaints by the victim regarding her ability to tolerate Klonopin or any of the adverse effects she claims to have

experienced. Rather, Degilio argues that records establish that the victim was "steady on her feet, well oriented to time and place, and fully cognizant of her surroundings and situation." Brief of Appellant, at 66. Degilio argues that the medical records would have demonstrated that the victim was not mentally or physically impaired or compromised by the medication, thus countering a key element of the Commonwealth's case against him. This claim is meritless.

The record demonstrates that, at trial, counsel vigorously cross-examined both the victim and Dr. Levinson, making frequent reference to the victim's medical records and her use of Klonopin. Counsel challenged the victim's claim that she had never previously been prescribed Klonopin. *See* N.T. Trial, 5/12/14, at 103-04. Counsel elicited testimony from the victim that, in the days immediately preceding the assault, she had successfully engaged in the normal activities of daily living, including providing child care for five children and driving, and never asked for an adjustment to her Klonopin prescription. *Id.* at 114-15. Counsel thoroughly cross-examined her regarding the assault and the fact that she informed people in the behavioral care unit that she was not one hundred percent certain the assault had happened. *Id.* at 140.

Similarly, counsel cross-examined Dr. Levinson regarding the fact that the victim's Klonopin prescription remained consistent during the time spanning her discharge from her first hospitalization, through the date the assault occurred, and during and after her second hospitalization following the assault. Counsel elicited testimony from Dr. Levinson that the victim's medical

records revealed a diagnosis for psychosis, which causes "perceptual abnormalities which can include hallucinations and/or delusions," N.T. Trial, 5/13/14, at 42. Counsel also questioned him regarding a notation in her records indicating possible confusion and hallucinations upon readmission to the BHU two days after the incident in question. *Id.* at 45.

At the PCRA hearing, trial counsel testified that he, along with his associate, reviewed all of the victim's medical records prior to trial. However, counsel testified that he was judicious in his use of the records at trial, stating:

> [I]n all honesty, . . . [a] lot of those records, whether it's Dr. Schilke or other of the treating physicians and nurses, they cut both ways. There's positive parts and there's negative parts.
>
> . . .
>
> [A]t trial, I put in the hospital reports that I, in my opinion and in my strategy, I felt were the appropriate reports to put in because, as I said previously, there's—a lot of those reports, you can pick things out that are positive for the defense, and then in those reports, there's things that are negative for the defense. So I didn't want to put in a whole slew of reports that can cut both ways as a lot of those could. So I tried to keep it as clean as I felt possible. That was my strategy. That's the strategy I felt was appropriate, and that's the strategy and plan I took.

N.T. PCRA Hearing, 4/1/19, at 183, 194

The Commonwealth questioned Attorney Waldron about his decision not to use specific exhibits referenced in Degilio's PCRA petition. He responded:

> The reason I did not put in records such as this, you can pick and choose in these records. You can look at what is put in the PCRA petition and say Exhibit J and it will say what's listed in the PCRA, no confusion, no disorganized thinking, well oriented in time.
>
> Then you can look at Exhibit J or some of these other exhibits, each and every one, and then there's things that would then make

her, [the victim], look sympathetic, look like a victim, and I just felt—I didn't want the jury pouring over these documents and saying, well, this is positive. This is negative. This is that. She's sympathetic here. She's not—I think—I wanted to keep it cleaner than just having them—you know, you can pick and choose. Hindsight is always 20/20, and there were positive things and negative things in mostly all these documents.

So I thought it was prudent to take the course that I took and I put in some documents, I used cross examination and I felt I'm going to use cross examination than put in a whole boatload of documents. That was the course. That was my strategy. I wasn't going to put in a lot of documents that had things that I think hurt me while at the same time may help me into evidence.

*Id.* at 196-97.

Based upon the foregoing, we concur with the PCRA court's conclusion that counsel's chosen course of action with respect to his use of the victim's medical records had a reasonable basis. Trial counsel did not want to provide the jury with voluminous records that, while containing some information helpful to the defense, could have also elicited sympathy for the victim. As a result, counsel opted to rely heavily on vigorous cross-examination to cast doubt on the victim's credibility and her version of events. This strategy was a reasonable one and, as such, Degilio cannot establish that trial counsel was ineffective.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/20