J-S07045-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| THUY VAN VO | : | |
| | : | |
| Appellant | : | No. 2314 EDA 2022 |

Appeal from the PCRA Order Entered August 18, 2022
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0000472-2011

BEFORE:  DUBOW, J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED AUGUST 1, 2023**

Appellant, Thuy Van Vo, appeals from the order entered in the Bucks County Court of Common Pleas, which denied his first petition filed under the Post Conviction Relief Act ("PCRA").[1]  We affirm.

In its opinion, the PCRA court accurately sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> Did the [PCRA] court err in its denial of Appellant's PCRA claim that he was denied his constitutionally guaranteed right to effective representation, and trial counsel was ineffective when she failed to properly advise Appellant of his right to testify, failed to prepare him to testify, and failed to provide to him sufficient information and advice so as to allow Appellant the ability to make a knowing, intelligent

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

and voluntary decision whether or not to testify?

Did the [PCRA] court err in its denial of Appellant's PCRA claim that he was denied his constitutionally guaranteed right to effective representation, and trial counsel was ineffective based upon multiple instances of attorney error resulting in cumulative prejudice which deprived Appellant of a fair trial and resulted in his conviction, which would not have occurred had the following errors not been committed:

Trial counsel did not obtain surveillance video from the Parx Casino which would have displayed that Appellant did not, as alleged by the detectives, gamble on a date leading up to the murder, thus depriving Appellant of the ability to show the jury that the police and prosecution were not entirely accurate in their recitation of the events, which could have raised reasonable doubt;

Trial counsel did not locate, retain and call at trial a competent expert witness in the area of cell phone transmissions and cell tower technology, relying instead upon Manfred Schenk, who was wholly unqualified to provide such testimony in a convincing or adequate manner;

Trial counsel failed to object or seek to preclude the police detective from testifying about cell phone transmissions and cell tower technology when the detective had no expertise in such area and was not qualified as an expert in such specialized areas of telecommunications;

(Appellant's Brief at vi-vii).

Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error. **Commonwealth v. Conway**, 14 A.3d 101, 108 (Pa.Super. 2011), *appeal denied*, 612 Pa. 687, 29 A.3d 795 (2011). This Court grants great deference to the findings of the PCRA court if

the record contains any support for those findings. ***Commonwealth v. Boyd***, 923 A.2d 513, 515 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. ***Commonwealth v. Dennis***, 609 Pa. 442, 17 A.3d 297 (2011).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Diane E. Gibbons, we conclude Appellant's claims merit no relief. The PCRA court opinion comprehensively discusses and properly disposes of the claims raised. (***See*** PCRA Court Opinion, filed September 9, 2022, at 10-19) (finding: there was no arguable merit to Appellant's claim that trial counsel failed to advise Appellant of his right to testify because trial counsel credibly testified that she met with Appellant numerous times, typically has at least two conversations with her clients about the right to testify, and would never tell a client that he or she could not testify; regarding counsel's failure to obtain surveillance footage from Parx Casino, Appellant failed to demonstrate that any surveillance footage existed and that it was retained by Parx Casino at time of trial; court also credited trial counsel's testimony that her investigator contacted Parx Casino to obtain information about whether Appellant was present at casino during the relevant times and she would have used any helpful evidence she obtained at the trial; Appellant failed to establish that trial counsel was ineffective for failing to call expert in area of cell phone

transmissions and cell tower technology because Appellant failed to identify expert who was available and willing to testify to information that would have been helpful to Appellant's defense; Appellant also failed to identify specific testimony offered by Detective Rudisill that Appellant alleges was impermissible expert testimony; Detective Rudisill's testimony about content of Appellant's cell phone records and location of cell phone towers required no specialized knowledge and was permissible lay testimony;[2] Appellant's individual claims lack merit and cannot form basis to establish cumulative prejudice). Accordingly, we affirm on the basis of the PCRA court's opinion.

Order affirmed.

_____

[2] Additionally, we note that trial counsel objected multiple times on the grounds that certain inquiries were beyond Detective Rudisill's expertise. (*See* N.T. Trial, 12/7/2011, at 195-97). The court sustained one of the objections and overruled the other two, ensuring that the questions were limited to reviewing the content of Appellant's cell phone records and the locations of cell phone towers, information which did not require specialized knowledge of cell tower technology. (*See id.*) The court further instructed the jury as follows to clear up any confusion on its ruling:

> The Court: … I just want the jury to be clear on--in my ruling concerning the telephone records that the detective has testified very clearly about what the telephone calls and the towers that relate to those telephone calls, his testimony or statements concerning why certain calls aren't reflected in the records is not admissible. But he can certainly testify that they're not included in the records.

(*Id.* at 199).

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/1/2023

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  :  No.    CP-09-CR-472-2011

v.                                                         :

THUY VAN VO                                   :

### OPINION

Petitioner, Thuy Van Vo, filed an appeal from this Court's order dated August 18, 2022,

denying his Second Amended Petition for Relief Pursuant to the Post Conviction Relief Act

("PCRA"), 42 Pa.C.S. § 9541 *et seq.*, following a hearing held on August 31, 2021.

### Factual and Procedural History

The factual and procedural history of this case was summarized by this Court for purposes

of direct appeal as follows:

> At the time of her death, the victim, thirty-year-old An-Hnan Thi Huynh,
> nicknamed "Annie," lived on Kendrick Street in Philadelphia with her six-year-old
> son and her parents. She was the owner and operator of Kim's Nails located on
> Second Street Pike in Upper Southampton, Bucks County.
>
> The victim was killed on Monday morning, November 8, 2010. At 7:56
> that morning, the victim dropped her son off at First Children's Academy, located
> less than one mile from Kim's Nails. The videotape retrieved from the school by
> investigators depicted the victim walking her son to his classroom, saying goodbye
> and then leaving the building. N.T. 12/6/11, p. 174; N.T. 12/7/11, pp. 14, 16;
> Exhibit C-2. At approximately 9:00 a.m., two employees and a customer arrived
> at Kim's Nails. When they drove into the shopping center where Kim's Nails is
> located, they found the victim's car parked in the fire lane in front of the salon. The
> lights inside the salon were on. The front and the back doors of the salon were
> locked. Upon entering the salon, the witnesses observed the victim's keys, her
> jacket and a cup of iced coffee at the victim's workstation located in the front of the
> salon. The bathroom door of the salon was locked. When the employees could not
> locate the victim, they called 911. N.T. 12/6/11, pp. 51-58, 80-81, 118-120.

Upper Southampton Police Officer Ryan Hand responded to the scene shortly after 9:15 a.m. Officer Hand forced his way into the bathroom and found the victim lying on the floor unconscious. N.T. 12/6/11, p. 141. She showed clear signs of having been involved in a physical altercation. Her hair was disheveled, an earring had been torn from her ear and there was a small amount of blood on her lips and hands. N.T. 12/6/11, pp. 172, 174; N.T. 12/12/11, p. 120. The officer attempted to resuscitate her without success. She was subsequently pronounced dead on scene by emergency medical personnel. N.T. 12/6/11, pp. 142-143.

Forensic pathologist Dr. Ian Hood performed the autopsy. Dr. Hood determined the cause of death to be strangulation. He testified that blood flow to the brain would have to be interrupted for a minimum of three to four minutes for death to result from manual strangulation. N.T. 12/12/11, p. 105. Based upon his findings during the autopsy, Dr. Hood testified that it was his opinion that the victim was strangled, began breathing on her own a minute or so later, and then was strangled a second time, causing her death. N.T. 12/12/11, pp. 104-105.

Investigation of the scene revealed no signs of forced entry and no evidence of a struggle inside the salon. N.T. 12/6/11, p. 148. The victim's purse, her two cell phones and the start-up cash for the salon had been taken. N.T. 12/6/11, p. 167. The victim's cell phones were found in a plastic bag near a dumpster at the opposite end of the shopping center. The victim's purse was never recovered. N.T. 12/6/11, p. 219.

At approximately 10:00 a.m., police were advised that [Petitioner], identified as the victim's boyfriend, had arrived on scene. NT. 12/6/11, pp. 180, 209. Testimony at trial established that he arrived after receiving a telephone call from the victim's employees who had advised him that they could not locate the victim. Although he had been told that the victim was missing and could observe that police and emergency medical personnel were in the salon, [Petitioner] did not appear to be distraught. He did not ask the police about the victim's whereabouts, her condition or what was happening inside the salon. N.T. 12/6/11, p. 211. [Petitioner] showed no emotion when he was told that the victim had died. N.T. 12/6/11, p. 214.

In speaking with police, [Petitioner] identified himself as the victim's boyfriend. N.T. 12/6/11, p. 214. He told investigators that he met the victim in approximately 2008. N.T. 12/7/11, p. 77. [Petitioner] described the victim's daily routine, stating that she would arrive at the salon prior to 9:00 a.m. He stated that she would park in the front of the salon, let herself in through the front door with her key, walk to the rear of the salon, remove the bolt from the inside of the back door and then open the back door. He stated that the victim would then move her car to the parking lot located behind the salon. N.T. 12/6/11, pp. 185-186. [Petitioner] recited the victim's social security number, date of birth, and cell phone numbers from memory. N.T. 12/6/11, p. 214. [Petitioner] told a detective that he

2

last saw the victim at her salon on Saturday, November 6, 2010, two days before her death. N.T. 12/6/11, p. 22.

The police investigation revealed the following events leading up to the murder. On September 27, 2010, the victim opened a business bank account for Kim's Nails at the Southampton branch of Citibank. N.T. 12/8/11, pp. 128, 132-133. [Petitioner] was present when the victim opened that account. At the time it was opened, the victim was the only person authorized to withdraw funds from the account. N.T. 12/8/11, p. 128. However, on October 30, 2010, the victim signed a form authorizing [Petitioner] to make withdrawals. N.T. 12/18/11, pp. 131, 133-134; Exhibit C-28. At the time she did so, the victim specifically requested that the bank call her to obtain her permission before allowing [Petitioner] to withdraw any money. N.T. 12/8/11, pp. 132, 141. When [Petitioner] was advised that the victim had made that request, [Petitioner] told the bank teller, "Oh yeah, Annie doesn't trust me." N.T. 12/8/11, p. 160. Despite assurances that she would be called if [Petitioner] sought to withdraw funds from the account, no such calls were made. N.T. 12/8/11, pp. 158-159.

In the days leading up to the murder, [Petitioner] withdrew large sums of money from the account. On November 1st, eight days before the murder, [Petitioner] made two withdrawals; one for $1,700, one for $1,800. On November 4th, [Petitioner] withdrew $1,500 in large bills. The next day, November 5th, [Petitioner] withdrew $2,000 in hundred dollar bills. On Saturday, November 6th, [Petitioner] withdrew $3,000 in hundred dollar bills. N.T. 12/8/11, pp. 135-136, 142-144; Exhibits C-26, C-27. During this period of time, one of the bank tellers noticed a change in [Petitioner]'s behavior. That witness testified that during her initial contact with [Petitioner], he was pleasant and talkative. She stated that in the days leading up to murder, [Petitioner] became very withdrawn, soft spoken and began to stare at his feet during their interactions. N.T. 12/8/11, pp. 161-163.

Cell phone and cell tower records placed [Petitioner] in the area of Parx Casino, located on Street Road in Bensalem Township, Bucks County on the same dates [Petitioner] made the withdraws from the victim's bank account. On November 5th, at 10:53 a.m., [Petitioner] withdrew $2,000 from the Citibank account. At 1:44 p.m. and 1:45 p.m. on that date, [Petitioner]'s cell phone accessed the cell tower adjacent to Parx Casino. A services manager from Parx Casino testified that [Petitioner] used his Parx Casino player's club card at the casino at approximately 4:02 a.m. on Saturday, November 6th. N.T. 12/9/11, pp. 220-221. At 10: 17 a.m. on that date, [Petitioner] withdrew $3,000 from the Citibank account. At 10:35 a.m. and on several occasions between 1:30 and 1:38 p.m., [Petitioner]'s cell phone again accessed the cell tower near Parx Casino. N.T. 12/12/11, pp. 171-172; Exhibit C-29.

Evidence presented at trial also established that immediately prior to the murder, at the same time [Petitioner] was removing money from the victim's bank account, the victim was angry and upset with [Petitioner]. At 4:26 p.m. on

3

Saturday, November 6th, two days before the murder, [Petitioner] called the victim and left the following message:

> "Hello, my wife. Wife, don't be upset. Forgive me. I apologized already, OK? What's happened has happened, ok? Whatever I did to make you upset, you know. I already told you I'm sorry, ok? I promise if we ** we should talk together, my wife, ok? I hope you aren't upset, OK? I thank you a lot, OK? OK, I love you. Bye."

Exhibit C-23.

During the early morning hours of the following day, Sunday, November 7th, the victim sent a text message to another male acquaintance, Khoung Ly, stating that she wanted to ask him something. Mr. Ly called the victim immediately after receiving this text message. During that conversation, the victim told Mr. Ly that "somebody knew her account and Social Security number, bank account, and took all [her] money." The victim asked Mr. Ly what she should do. He told her to take legal action. N.T. 12/9/11, pp. 140-142; Exhibit C-44.

Later that same morning, Mr. Ly drove to the victim's residence and took her and her family out to eat, after which Mr. Ly, the victim and their children then went to Chuck E. Cheese. At that time Mr. Ly was driving a Mercedes. N.T. 12/9/11, pp. 12-13, 135-136. At 10:53 that morning, [Petitioner] called the victim and left the following message:

> "Someone called me, I answered but they hung up. It was cut off. I'm afraid if I talk with you, you will be upset...Don't think a lot, you know, you will have a headache. So I didn't want to call. I feel ashamed, really suffering, because I did you wrong. Don't think bad about me, you know, right? So I apologize/ask for forgiveness, Nhan. What we lost we can put back together again. I don't know what to do, how to make you feel ok. I hope you will have sympathy for me, don't be upset. I apologize to you. OK? Call me to talk. OK, Nhan. Bye-bye."

Exhibit C-23.

[Petitioner] called the victim five times on Sunday evening. At 5:48 p.m., he called the victim and left the following message:

> "Excuse me, Nhan, did Khoung come and visit with you today? I know he came and visited you. He came in his Mercedes."

Exhibit C-23.

4

During each of these calls, [Petitioner]'s cell phone accessed the cell tower closest to the victim's home. N.T. 12/12/11, pp. 174-175. At 7:40 Sunday night, [Petitioner] again called the victim and left the following message:

> "Excuse me, Nhan, call me back! [not clear] ... on Tuesday, not on Monday. OK? OK? Bye."

> Exhibit C-23. This call was made from the vicinity of [Petitioner]'s home. N.T.12/12/11, pp. 174-175.

The victim's father testified that on that Sunday evening, he heard the victim arguing with someone on the telephone. He stated that after that argument, his daughter was very sad. N.T. 12/9/11, pp. 21-22. That night, the victim left a voicemail message on [Petitioner]'s cellular telephone. She told [Petitioner], "I am suffering and in pain beyond heaven." N.T. 12/7/11, p. 225; N.T. 12/8/11, p. 62.

On the morning of her murder, a tearful victim told her mother, "He took all of [my] money." N.T. 12/9/11, pp. 13, 17. At 7: 17 a.m., [Petitioner] made a call from his cell phone. Cell tower records established that at the time he made this call, his cell phone accessed tower 32261, the cell tower located across the street from the murder scene. N.T. 12/7/11, pp. 189-192; N.T. 12/12/11, pp. 163, 175; Exhibits C-9, C-18. [Petitioner]'s cell phone accessed that same tower when he made a call from the murder scene at the request of police who were attempting to locate the victim's cell phones. N.T. 12/12/11, p. 176.

On the night of the murder, investigators searched [Petitioner]'s car and found over $3,700 in cash inside the center console. N.T. 12/7/11, pp. 83, 100.

On November 10, 2010, a search warrant was executed at [[Petitioner]'s home. N.T. 12/12/11 p. 29. During the search of [Petitioner]'s room, investigators found $1,830 in cash under [Petitioner]'s mattress. N.T. 12/12/11, p. 36. During that search, the contents of a trash can located in [Petitioner]'s bedroom were seized. N.T. 12/7/11, p. 165; Exhibits C-15, C-16. Among those items found in that trash can, police found a set of white linen gloves. N.T. 12/12/11, pp. 28-29; Exhibit C-33. The gloves were inside out. N.T. 12/12/11, p. 43. On a finger of one of the gloves, there was a small stain. That stain tested presumptively positive for blood. N.T. 12/9/11, pp. 38-44. There was insufficient quantity to conduct further serological testing. N.T. 12/9/11, pp. 43. The DNA profile obtained from that stain matched the DNA profile for the victim in all 16 areas tested. N.T. 12/9/11, p. 95. The probability of randomly selecting an unrelated individual exhibiting this combination of DNA types is approximately 1 in 1.9 quintillion from the Caucasian population, approximately 1 in 8.5 sextillion from the African-American population and approximately 1 in 3.8 quintillion from the Hispanic population. N.T. 12/9/11, p. 86.

A human head hair was found inside that same glove. Examination of the hair revealed that it had been forcibly pulled from the scalp. NT 12/12/11, p. 43. The DNA profile from that hair matched the DNA profile of [Petitioner] in all 16 areas tested. The probability of randomly selecting an unrelated individual exhibiting this combination of DNA types is approximately 1 in 7.9 sextillion from the Caucasian population, approximately 1 in 250 sextillion from the African-American population and approximately 1 in 3.7 sextillion from the Hispanic population. N.T. 12/9/11, pp. 94-95.

Following the murder, [Petitioner] made numerous false, inconsistent and incriminating statements. First, [Petitioner] lied about his whereabouts on the morning of the murder. At the time of the murder, [Petitioner] lived on Godfrey Avenue, in Philadelphia, approximately 10.2 miles from Kim's Nails. NT 12/12/11, pp. 153-154. When interviewed by police, [Petitioner] stated that he awoke at approximately 7:00 a.m. He claimed that he then made a phone call to Pediatric Dental Association to cancel an appointment that the victim had made for her son. He stated that after making that call he ate breakfast, watched television and took a shower. N.T. 12/6/11, p. 224. Contrary to his assertion, [Petitioner] did not call the dentist's office from his Philadelphia home. [Petitioner]'s cell phone records established that [Petitioner] did make a call from his cell phone at 7:17 a.m. However, cell tower records established that at the time he made this call, his cell phone accessed tower 32261, the cell tower located across the street from the scene of the murder. N.T. 12/7/11, pp. 189-192; N.T. 12/12/11, pp. 163, 175; Exhibits C-9, C-18. [Petitioner] was, therefore, in the immediate vicinity of Kim's Nails immediately prior to the murder not at home as he claimed.

[Petitioner] also lied about his whereabouts on Sunday, November 7, 2010. He told police that on that date, he was at home all day, leaving only briefly to get gas. N.T. 12/7/11, p. 219. He asserted that while at home, he called the victim on his cell phone. N.T. 12/7/11, pp. 219-220. Cell phone/cell tower records and evidence that [Petitioner] knew that Mr. Ly had been to the victim's home and had driven a Mercedes that day established that [Petitioner] was, in fact, in the immediate vicinity of the victim's home when he called her on Sunday afternoon. N.T. 12/12/11, pp. 174-175; Exhibit C-23.

[Petitioner] also made false and contradictory statements about the money he took from the victim's bank account. At the time he made the withdrawals, he told a bank employee that he was merely juggling money between accounts. He also told that employee that the money was going to be used to open another salon. N.T. 12/8/11, pp. 160-161. When questioned by police about the large cash withdrawals, [Petitioner] claimed that he gave the money to the victim for a "land deal" in Vietnam. N.T. 12/7/11, pp. 215-216.

[Petitioner] also provided false information about the money found in his car. As previously stated, on the night of the murder [Petitioner] had $3,700 in cash in the center console of his car. At that time, [Petitioner] told investigators that his

6

sister was on vacation in Vietnam, that she asked him to retrieve the money from her home so that her husband, who allegedly had a gambling problem, would not have access to that money. [Petitioner] claimed that he was planning to wire the money to his sister. N.T. 12/7/11, pp. 83-84. A few days later, [Petitioner] claimed that he had, in fact, wired the $3,700 to his sister. N.T. 12/7/11, pp. 105-106. At trial, [Petitioner]'s sister admitted that she never received money from [Petitioner] while she was in Vietnam. N.T. 12/8/11, p. 81.

[Petitioner] also made a number of inconsistent statements regarding his relationship with the victim at the time of the murder. During his interview on the night of the murder, [Petitioner] claimed that he and the victim had not been arguing. N.T. 12/7/11, p. 79. At a later interview, [Petitioner] asserted, "Annie and I never argue." N.T. 12/7/11, p. 163. When confronted with the fact that the investigators already knew there had been an argument, [Petitioner] admitted that he and the victim had argued about the casino the night before her murder. N.T. 12/7/11, pp. 163-164. [Petitioner] then asserted he and the victim had argued about the scheduling of the dental appointment. N.T. 12/7/11, p. 223. [Petitioner] claimed that he was not jealous of the victim spending time with Mr. Ly on Sunday before her death. His conduct and the content of his voicemail message on that date demonstrated otherwise. N.T. 12/7/11, p. 84.

On November 9, 2010, the police went to [Petitioner]'s home. When they were finally admitted into the residence [Petitioner] told the detectives that he had just taken fifty Benadryl pills and that he wanted to die. N.T. 12/7/11, pp. 112, 157-159.

On November 12, 2010, [Petitioner] was arrested for the murder of An-Hnan Thi Huynh.

Opinion, 10/26/12, at 1-10 (footnotes omitted).

On December 13, 2011, following a trial by jury, Petitioner was convicted of First Degree Murder, 18 Pa.C.S. § 2501(a); 18 Pa.C.S. § 2502(a) and Theft by Unlawful Taking, 18 Pa.C.S. § 3921(a). On February 2, 2012, Petitioner was sentenced to life imprisonment, with a consecutive term of incarceration of 2½ to 5 years. On February 13, 2012, Petitioner filed a post-sentence motion. By order dated June 29, 2012, Petitioner's post-sentence motion was denied. Petitioner thereafter filed notice of appeal to the Superior Court of Pennsylvania, which affirmed the judgment of sentence on July 23, 2013. On August 22, 2013, Petitioner filed a Petition for

7

Allowance of Appeal with the Supreme Court of Pennsylvania. On January 22, 2014, the Supreme Court denied the Petition.

On November 25, 2014, Petitioner filed a timely pro se Petition for Post-Conviction Collateral Relief. On December 2, 2014, this Court appointed Elissa Heinrichs, Esquire, to represent Petitioner in the PCRA proceedings. On April 7, 2015, Petitioner filed a counseled Amended Petition for Post-Conviction Relief. On March 31, 2016 (docketed April 3, 2017), upon consideration of her resignation, this Court vacated Ms. Heinrichs' appointment and appointed Dean Malik, Esquire, to replace Ms. Heinrichs and to represent Petitioner. On March 21, 2017, Mr. Malik filed a Motion for Court Approval of Expert Services. By order docketed January 12, 2018, this Court denied the Motion for Court Approval of Expert Services. That same day, this Court vacated the appointment of Mr. Malik as he was no longer serving as Court-Appointed/Conflict Counsel. This Court appointed Patrick J. McMenamin, Jr., Esquire to represent Petitioner. On April 13, 2018, Petitioner filed a Second Amended Petition for Post-Conviction Collateral Relief. The Commonwealth filed its Answer on June 15, 2018. On August 31, 2021, a PCRA hearing was held. Following the hearing, the parties submitted memoranda of law. On August 18, 2022, this Court entered an order denying Petitioner's Second Amended Petition for Relief Pursuant to the Post Conviction Relief Act.

## Analysis

Petitioner raised the following issues in his Second Amended Petition for Post-Conviction Relief:

1. Petitioner was denied his constitutionally guaranteed right to effective representation, and trial counsel was ineffective when she failed to properly advise Petitioner of his right to testify, failed to prepare him to testify, and failed to provide him sufficient information and advice so as to allow Petitioner the ability to make a knowing, intelligent, and voluntary decision whether or not to testify;

8

a. Petitioner told trial counsel he wanted to testify (See Exhibit "A", Petitioner's Affidavit))

b. Trial counsel did not discuss the pros and cons of Petitioner testifying in his own defense, or not (See Exhibit "A");

c. Trial counsel did not tell Petitioner he had the right to testify (See Exhibit "A");

d. Trial counsel specifically told Petitioner he was not going to testify (See Exhibit "A"); and,

e. There is no evidence in the record that Petitioner was advised that he had the right to testify or that Petitioner knowingly, intelligently, and voluntarily waived his right to testify (See, N.T., Trial, December 12 & 13, 2011).

2. Petitioner was denied his constitutionally guaranteed right to effective representation, and trial counsel was ineffective based upon multiple instances of attorney error resulting in cumulative prejudice which deprived Petitioner of a fair trial and resulted in his conviction, which would not have occurred had the following errors not been committed:

a. Trial counsel did not obtain surveillance video from the Parx Casino which would have displayed that Petitioner did not, as alleged by the detectives, gamble on a date leading up to the murder, thus depriving Petitioner of the ability to show the jury that the police and prosecution were not entirely accurate in their recitation of the events, which could raise reasonable doubt (See Exhibit "A");

b. Trial counsel did not locate, retain, and call at trial, a competent expert witness in the area of cell phone transmissions and cell tower technology, relying instead upon Manfred Schenk, who was wholly unqualified to provide such testimony in a convincing or adequate manner (See, N.T., December 9, 2011, pp. 155 - 217);

c. Trial counsel failed to object or seek to preclude the police detective from testifying about cell phone transmissions and cell tower technology when the detective had no expertise in such area and was not qualified as an expert in such specialized areas of telecommunications (See, N.T., December 7, 2011, pp. 188 - 206);

d. Where the failure of individual claims is grounded in the lack of prejudice individually, the cumulative prejudice from those individual claims may properly be assessed at hearing (see, Commonwealth v. Koehler, 36 A.3d 121 (Pa. 2012)).

9

e. The aforementioned claims have arguable merit;

f. Trial counsel's aforementioned errors lacked a reasonable basis designed to effectuate the client's interests; and,

g. As a result of trial counsel's cumulative errors Petitioner suffered prejudice to the effect that there is a reasonable probability of a different outcome but for counsel's error(s).

Second Amended Petition for Post-Conviction Relief, 4/13/18, at ¶¶ 38-39.

To obtain PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated grounds for relief set forth in 42 Pa.C.S. §9543(a)(2). Commonwealth v. Reid, 99 A.3d 470, 481 (Pa. 2014). Petitioner relies on 42 Pa.C.S. § 9543(a)(2)(ii), ineffective assistance of counsel.

The standards applicable to claims of ineffective assistance of counsel are well established. Counsel is presumed to be effective and the burden is on the petitioner to prove otherwise. Commonwealth v. Smith, 17 A.3d 873, 883 (Pa. 2011). This presumption arises from the recognition that it is "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland v. Washington, 466 U.S. 668, 689 (1984). Therefore, when evaluating ineffectiveness claims, "judicial scrutiny of counsel's performance must be highly deferential." Id., 466 U.S. at 671. A reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.

To prevail on an ineffectiveness claim, a petitioner must satisfy, by a preponderance of the evidence, the performance and prejudice standard set forth in Strickland. Commonwealth v. Cousar, 154 A.3d 287, 296 (Pa. 2017). Specifically, the petitioner must establish that:

10

(1) The underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different.

Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 2001)).

A petitioner bears the burden of proving all three prongs of this test. Commonwealth v. Watley, 153 A.3d 1034, 1040 (Pa.Super. 2016). A claim of ineffectiveness may be denied by a showing that the petitioner's evidence fails to meet any of these prongs. Commonwealth v. Washington, 927 A.2d 586, 594 (Pa. 2007). A court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; if a claim fails under any necessary element of this test, the court may proceed to that element first. Cousar, 154 A.3d at 297. "[I]f a claim fails under any required element of the Strickland test, the court may dismiss the claim on that basis. Commonwealth v. Housman, 226 A.3d 1249, 1260-61 (Pa. 2020).

Under the first prong of the analysis, a petitioner must demonstrate that his claim has arguable merit. Trial counsel may not be deemed ineffective for failing to raise a meritless claim. Commonwealth v. Keaton, 82 A.3d 419, 426 (Pa. 2013).

Under the second prong of the analysis, defense counsel is afforded broad discretion to determine tactics and strategy. Commonwealth v. Fowler, 670 A.2d 153 (Pa.Super. 1996). "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." Commonwealth v. Puksar, 951 A.2d 267, 277 (Pa. 2008) (quoting Commonwealth v. Miller, 819 A.2d 504, 517 (Pa. 2002)). The U.S. Supreme Court explained a reviewing court's role in making this determination when it stated:

[t]he court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in a particular case. At the same time, the court should recognize that counsel is strongly

11

presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 690; Commonwealth v. Lesko, 15 A.3d 345 (Pa. 2011).

In determining whether counsel had a reasonable basis for his action, "we do not question whether there were other more logical courses of action which counsel could have pursued: rather, we must examine whether counsel's decisions had any reasonable basis." Commonwealth v. Rios, 920 A.2d 790, 800 (Pa. 2007). The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Commonwealth v. Stewart, 84 A.3d 701, 706 (Pa.Super. 2013). Counsel's decisions will be considered reasonable if they effectuated his client's interests. Id. at 707. If counsel's chosen course had some reasonable basis, the inquiry ends and counsel's assistance is deemed effective. Commonwealth v. Williams, 899 A.2d 1060, 1064 (Pa. 2006).

Under the third prong of the analysis, prejudice, a petitioner "must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction." Commonwealth v. Watley, 153 A.3d 1034, 1040 (Pa.Super. 2016) (quoting Commonwealth v. Spotz, 18 A.3d 244, 260 (Pa. 2011)). "A reasonable probability 'is a probability sufficient to undermine confidence in the outcome.'" Stewart, 84 A.3d at 707 (quoting Commonwealth v. Rathfon, 899 A.2d 365, 370 (Pa.Super. 2006)).

Petitioner was represented at trial by Deborah Weinman, Esquire. She was assisted by W. Joshua Buchanan, Esquire. In his first claim, Petitioner asserts that Ms. Weinman "prevented" him from testifying and was therefore ineffective. Memorandum of Law in Support of the Second Amended Petition for Post-Conviction Relief, at 18. Specifically, Petitioner asserts that trial counsel failed to tell him he had the right to testify (Id. at ¶ 38c) and told him he was not going to

12

testify without explanation (Id. at ¶¶ 38b, 38d). Based upon the evidence presented at the hearing, this Court finds that Petitioner claims to be without merit.

The decision of whether or not to testify lies with the defendant. Commonwealth v. Sandusky, 203 A.3d 1033, 1075 (Pa.Super. 2019). To establish ineffective assistance of counsel for failing to advise a defendant of his rights with regard to testifying, a defendant "must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf." Id. (quoting Commonwealth v. Nieves, 746 A.2d 1102, 1104 (Pa. 2000)).

The only evidence Petitioner offered to support his claim that trial counsel did not tell him that he had a right to testify was elicited during his direct testimony:

> [PCRA counsel] Do you remember anyone telling you that you had the choice to either testify or not testify?
>
> [Petitioner] No.

N.T. 8/31/21, at 38-39.

To support his claim that trial counsel prevented him from testifying, Petitioner offered the following testimony:

> [PCRA counsel] Did you meet with Ms. Weinman there at the Bucks County prison?
>
> [Petitioner] Correct.
>
> [PCRA counsel] Did you discuss the case with her?
>
> [Petitioner] Yes. Correct.
>
> [PCRA counsel] Did you discuss your defense with her?
>
> [Petitioner] Yes.
>
> [PCRA counsel] At the Bucks County prison, do you know how many times you met with her before your trial?

13

[Petitioner] I don't remember.

[PCRA counsel] Do you recall speaking with her at the Bucks County prison about testifying at your trial?

[Petitioner] Yes.

[PCRA counsel] And what did you tell her?

[Petitioner] I told her that I want to go -- to testify before the Court, to tell the Court that I am not guilty, but she said that no.

[PCRA counsel] Do you recall anything else she said to you?

[Petitioner] She said that it is not good for me to testify before the Court.

[PCRA counsel] Did she tell you why it was not good for you?

[Petitioner] No.

[PCRA counsel] What did you say when she told you it was not good for you to testify?

[Petitioner] I still say that I want to testify before the Court. She said, "No."

N.T. 8/31/21, at 32-33.

[PCRA counsel] Once your trial started at the courthouse, did you ever discuss with Ms. Weinman whether or not you would testify?

[Petitioner] No. I didn't talk to her, but she just told me that it is better to be quiet.

N.T. 8/31/21, at 34.

Trial counsel testified that she met with Petitioner "numerous times" in preparing for trial. N.T. 8/31/21, at 9. She testified that because 10 years had passed since the trial, she did not recall specific conversations she had with Petitioner. She testified that she was, however, sure she discussed with Petitioner the evidence she intended to present in Petitioner's defense.[1] N.T. 8/31/21, at 10, 22. With regard to whether Petitioner would take the stand, trial counsel testified

---

[1] Petitioner confirmed that trial counsel discussed the case and his defense with him. N.T. 8/31/21, at 32.

14

that she would "always have at least two conversations with [her clients] about whether or not to testify." N.T. 8/31/21, at 27. She explained,

> [B]efore the trial, I discuss with them their having the right to testify and I discuss with them my opinion as to whether or not they should testify and the reasons for it and then I ask them what they want to do and then try and convince them that my view is the correct view.
>
> \*\*\*
>
> When we get to the end of the case, if we decided they're not going to testify, I still discuss with them prior to resting whether or not they want to testify to double-check that that is the case.
>
> Q. So it's fair to say that these discussions, in your practice, would have occurred multiple times with the defendant; is that correct?
>
> A. Yes.

N.T. 8/31/21, at 16. She testified that "I would never tell a client that they weren't testifying." N.T. 8/31/21, at 26-27. She stated, "I would have discussed it with him and told him that it is up to him, but this is my opinion." N.T. 8/31/21, at 17.

> Finally, trial counsel testified:
>
> THE COURT: -- I know you can't remember exactly what you said to him, but did he know he had the right to testify?
>
> THE WITNESS: Yes.
>
> THE COURT: And did he know that it was his decision?
>
> THE WITNESS: Yes.
>
> THE COURT: And I take it you told him you didn't think it would be a good idea?
>
> THE WITNESS: Definitely.
>
> THE COURT: And then he made – was it his decision not to testify?
>
> THE WITNESS: Yes.

N.T. 8/31/21, at 23.

15

Trial counsel is an experienced attorney who, at the time of trial, had been practicing criminal defense for over twenty years[2] and who, during the course of the trial, proved herself to be a prepared, thorough and capable trial lawyer. This Court found her testimony to be credible. It defies logic to believe that she would, without cause or explanation, simply decide to deprive a defendant of a fundamental right to testify in his own defense in a first degree murder case. This Court accepts her testimony that she would never tell a defendant he or she could not testify and did not do so in this case. This Court also accepts her testimony that she advised him not to take the witness stand and, in accordance with her established practice, explained to him her reasons for making the recommendation and also explained to him that he had a right to testify and the decision of whether or not to testify was his.[3]

In contrast, Petitioner's testimony is insufficient to establish a claim for relief and is otherwise not believable. As to the issue of whether Petitioner was advised of his right to testify, this Court finds that Petitioner's testimony that he does not remember being told he had the right to testify to be insufficient to establish by a preponderance of the evidence that he was not, in fact, advised of that right. As to the remainder of his testimony, it strains credulity to believe that this defendant, on trial for his life, would accept being told he could not testify in his own defense without question, explanation or discussion during their numerous meetings wherein, as Petitioner concedes, they discussed the case and the defense that would be presented. N.T. 8/31/21, at 9, 32.

---

[2] Trial counsel testified that she has been practicing criminal defense since 1987. N.T. 8/31/21, at 8.

[3] PCRA counsel argues that testimony regarding "habit, routine and custom" is not proof of what actually occurred. Memorandum of Law in Support of the Second Amended Petition for Post-Conviction Relief, at 16-17. This argument overlooks the fact that trial counsel testified that she "always" followed her established practice and that she would never engage in the conduct Petitioner alleged.

16

Based on the evidence presented during the PCRA hearing, this Court finds that trial counsel did not prevent Petitioner from testifying and properly advised him regarding his right to testify.[4]

Petitioner next alleges trial counsel was ineffective for failing to "obtain surveillance video from the Parx Casino which would have displayed that Petitioner did not, as alleged by the detectives, gamble on a date leading up to the murder." Second Amended Petition for Post-Conviction Relief, 4/13/18, at ¶ 39(a). "Counsel cannot be faulted for failing to discover or present evidence if Appellant fails to meet the burden of establishing that the evidence exists." Commonwealth v. Fisher, 813 A.2d 761, 771 (Pa. 2002) (citations omitted). To date, Petitioner has failed to establish that any surveillance video ever actually existed, that it was retained by the casino, that it was in its possession at the time of trial or that any such surveillance video would establish that Petitioner was not present at Parx casino during the relevant periods of time. Petitioner has therefore failed to meet his burden of proof to support his claim of ineffective assistance. Moreover, counsel cannot be deemed ineffective where she took reasonable and appropriate measures to obtain the evidence. Trial counsel testified that her investigator did in fact contact Parx Casino while she was preparing Petitioner's defense. N.T. 8/31/21, at 12-13. Ms. Weinman confirmed that she directed her investigator to obtain any information he could find concerning whether or not Petitioner was at Parx Casino and that she would have used any information which was helpful to Petitioner. N.T. 8/31/21, at 24-25.

---

[4] Having found Petitioner's claim lacks merit, this Court finds it unnecessary to address whether trial counsel's advice not to testify was reasonable or whether Petitioner established the necessary prejudice to support a claim for relief. However, given PCRA counsel's characterization of the weight of the evidence and his assertion that Petitioner's testimony could have rebutted or explained much of the circumstantial evidence., (Memorandum of Law in Support of the Second Amended Petition for Post-Conviction Relief, 11/4/21, at 18), it is important to note that it appears that trial counsel's advice was reasonable given the evidence in the case and the out-of-court statements Petitioner had already made to police and other witnesses. See infra at. 1-7. Even a cursory examination of the record reveals that trial counsel's concern that if Petitioner took the stand, he would open himself up to "cross-examination about a lot of things that I don't think he would have been able to answer" was well founded. See N.T. 8/31/21, at 18.

17

Petitioner next alleges that trial counsel was ineffective for failing to "locate; retain and call at trial, a *competent* expert witness in the area of cell phone transmissions and cell tower technology." Second Amended Petition for Post-Conviction Relief, 4/13/18, at ¶ 39(b) (emphasis added). Petitioner alleges that the expert witness relied upon by the defense, Manfred Schenk, was "wholly unqualified to provide such testimony in a convincing or adequate manner." Second Amended Petition for Post-Conviction Relief, 4/13/18, at ¶ 39(b).

To establish ineffective assistance of counsel for the failure to present an expert witness, a petitioner "must articulate what evidence was available and identify the witness who was willing to offer such evidence." Commonwealth v. Bryant, 855 A.2d 726, 745 (Pa. 2004) (citations omitted). Petitioner did not present any evidence regarding what expert testimony was available and did not identify any witness willing to offer such expert testimony. His claim, therefore, fails.

Finally, Petitioner alleges that trial counsel was ineffective for failing to object or seeking to preclude the testimony of Detective Craig Rudisill. Second Amended Petition for Post-Conviction Relief, 4/13/18, at ¶ 39(c). According to Petitioner, Detective Rudisill's testimony was improper as he had no expertise in the area of "cell phone transmissions and cell tower technology" and "was not qualified as an expert in such specialized areas of telecommunications." Second Amended Petition for Post-Conviction Relief, 4/13/18, at ¶ 39(c). Petitioner fails to identify the specific testimony offered by Detective Rudisill he alleges to be objectionable. Rather, he merely cites to eight pages of Detective Rudisill's testimony offered on December 7, 2011. Second Amended Petition for Post-Conviction Relief, 4/13/18, at ¶ 39(c); N.T. 12/7/11, at 188-206. In this section of the notes of testimony, Detective Rudisill testified as to the contents of Petitioner's T-Mobile cell phone records. N.T. 12/7/11, at 188-206. Upon a review of the record, it is clear

18

that Detective Rudisill's testimony consists of permissible lay testimony. Moreover, Petitioner has failed to articulate how, if at all, he was prejudiced. Petitioner's claim, therefore, fails.

Finally, Petitioner raises a "cumulative prejudice" argument, claiming that he was "denied his constitutionally guaranteed right to effective representation, and trial counsel was ineffective based upon multiple instances of attorney error resulting in cumulative prejudice which deprived Petitioner of a fair trial and resulted in his conviction." Second Amended Petition for Post-Conviction Relief, 4/13/18, at ¶ 39. It is well established that "no number of claims which fail on their merits may collectively warrant relief." Commonwealth v. Reid, 259 A.3d 395, 420 (Pa. 2021) (citing Commonwealth v. Spotz, 18 A.3d 244, 320-21 (Pa. 2011)). Since each of Petitioner's individual claims lack merit, his allegation of cumulative prejudice must fail as well.

## Conclusion

For the reasons set forth above, this Court denied Petitioner's request for PCRA relief.

**BY THE COURT:**

9/9/22
**Date**

**DIANE E. GIBBONS, J.**

19